Good morning, Your Honors. Robert Helfing for the Appellant, Marine Martyr. In order for the defendants to have properly prevailed on their motion to dismiss, they need to have shown that the release unambiguously extinguished Marine Martyr's copyright interest in the screenplays, or that the defendants had made a plain and express repudiation before the limitations were met. Instead, they presented a release that didn't and a repudiation that wasn't. If Paramount had wanted to clearly, with regard to the release, if Paramount had truly wanted to clearly communicate that Marine Martyr was giving up her copyright interest, they could have asked her to sign an assignment of her rights to them. Or they could have had her execute a true general release, which would have said clearly that she was releasing all claims that she had against them of any kind. Or they could have drafted language of a more particular release, which specifically referred to the type of claim that they now claim she did release. Instead, they used particular language which did not refer to copyright, which didn't refer to the plaintiff's rights at all, and which didn't refer to the copyright or the writing contribution on which her copyright was based. I don't know what their intention was in drafting the release like this. I suspect that they wanted to pay as little as they could to get as much as they could, so that if a situation like this ever came up down the line, they'd be able to say what they're saying now. But I don't think we're ever going to know what their true intention was. What I do know is that the language that they used in the release in no way conveys to Marine Martyr or communicates to her that she was giving up her copyright interest. The terms of the release say that she's giving up claims which have arisen or are based in whole and part upon any matters occurring at any time prior to the date of the release. In order to apply that language to the facts of this case, the defendants never really go through this in their analysis of the case, but in order to apply that language to the claim at issue here, you have to go through three steps. The first one is you have to say that the claim is based on copyright. The second one is that you have to establish that the copyright is based on her writing contributions. And the third step is that the writing contributions occurred prior to the date of the release. I suppose if that didn't go far enough back in time for the release to apply, they would have gone back a fourth step and said that the acts that she was writing about occurred prior to the date of the release. The question is, how far back, how many steps do you allow them to take? All matters is pretty comprehensive, isn't it? Excuse me? All matters is pretty comprehensive. All matters is, but it doesn't say all matters. It says all matters that occurred prior to the date of the release. If they had used true general release language, if they had said all rights of any kind, which in fact in one of the cases that they cite is what the language that was used, there would be no doubt, there would be no appeal here, there would be no case here, there would be no doubt that this release applied. But they didn't do that. They used particular language. They used language that in no way gave Maureen Marder to understand that it referred to her copyright interest. Really? Yes, really. In my opinion, Your Honor. And the extrinsic circumstances that surrounded the execution of the release didn't give her that understanding either. You thought she had a copyright all along and that she just didn't choose to exert it for a long time? Your Honor, she had no reason to assert her copyright interest until 2003 because she believed, as the complaint alleges, that she had given away her rights to the film itself by means of that release. I don't believe she did, but that's what she believed. And so for that reason, there was nothing for her to assert between 1983 when she executed the release and 2003, which was the first she ever learned of anyone infringing that copyright. When Jennifer Lopez and Sony released the I'm Glad video, which infringed the copyright, she asserted her claim. Well, presuming that Lopez and Sony had permission, proper permission, from the copyright holder, why doesn't that fall within the general release given for Flashdance as to all properties on which it's based, any versions thereof in media, motion picture properties, etc., etc.? I mean, the language is pretty broad on that. This is it gives the releasee the right to make any changes as their role of discretion may determine that such picture Flashdance and the properties in which it is based and any versions thereof in any media, which motion picture and properties and any versions of them may be published, exhibited, advertised, exploited by releasees. I mean, and assuming that they properly gave permission for Sony and Lopez to make this version, then why isn't that covered by the release? If she believes that she's given up the rights to the movie? Well, first of all, we don't know that Sony actually did give them permission to do that. Well, it's hypothetical. We think so because, I mean, we've understood there's a settlement, but they haven't asserted otherwise. I'm just saying if in fact that Sony and Lopez had permission, legal permission by the copyright holder to whom the release was granted to go ahead and make the video, what's wrong? Why does she have a claim based on this release? Your Honor, I don't believe this language gives Sony that right. It might give Paramount that right. Right. What's the restriction on assignment of the right, though? There is none. Yeah, so Paramount can assign it to whomever they want to so long as it's done legally, right? I agree with that. Yeah. Assuming that the assignment was properly made to Sony, what's the problem? If that happened, Your Honor, then Sony would be able to get out on a motion for summary judgment. We came to them and said, they told us that they were given permission, or not that they were given permission. It's clear that they made that movie without, excuse me, the video without permission. They came back and said, we settled that claim. We didn't have permission when we made it, but we've now spoken to Paramount and we've entered into some kind of a deal. We've settled the claim somehow. We said, how did you do that? Show us the settlement. Show us the terms of the settlement. What were they? Did they actually give you permission? Did they give you, you say they gave you a covenant not to sue. That's not permission. That just means they're not going to sue you for it. What were the terms of the settlement? They wouldn't tell us, and that's why they're here today. Well, they're here today because you sued them, but do you have any standing even to sue them? You're not a copyright holder, a registered copyright holder. How can you bring a suit against them? We have standing because we own the copyright. You haven't registered it. Paramount registered it. What? You haven't registered it. Well, we couldn't register it. Do you have standing to bring a suit to enforce a copyright? Well, then, Your Honor, then I think you'd be saying that someone who later alleges to be a co-owner where the copyright owner, where the defendant is already registered, could never bring this type of a suit because someone else would have already registered it. And once someone's registered, they're not going to give a registration to somebody else for the same work. No. We couldn't register it because Paramount already did. Then how can you claim an infringement suit? I mean, you have to get some declaration of ownership before you can maintain an infringement suit, wouldn't you say? Yes, Your Honor, and that's exactly what we're asking the district court to do. Right, you did, but you also asked for an infringement, so that's premature unless the district court or this court makes a declaration that you're a co-owner of the copyright, right? At the district court level, we're asking for a declaration that we are a co-owner. That would give us standing then to sue Sony and Lopez. But so far, you don't have that standing. That's correct, Your Honor. How, on one hand, can you argue or concede that the release extinguished your rights in the motion picture but did not extinguish your rights in permissible uses of the motion picture? I don't believe that it did, Your Honor. I only say that that's what Maureen Marder believed. Right, but that's her position. I understand you differ with your client on what the scope of the release was, but if she really believed that she was releasing, and I appreciate the candor of your concession, but if she really thought that she was releasing her interest in the movie, which it seems likely because she didn't assert any interest, then doesn't that carry with it the consequence that if there's a permissible use, she's stuck? I don't believe it does, Your Honor. The only reason that she can't sue Paramount now, she had a faulty understanding of what this release means. The only reason she can't sue Paramount for profits made from the movie itself is because the statute of limitations as to that claim has run. Otherwise, she would be able to do that. She's now suing only for the infringement, which occurred in 2003. The time for suing Paramount for the movie has long since passed. But if this were back in 1985, and Maureen Marder had come to me, I would be advising her to sue Paramount for profits from the movie, for accounting, I should say. I think it's also important to note that Paramount even... You know, you also have this broad paragraph that follows the release of claims related to any matters, and that says, Yes, Your Honor. No, it doesn't, Your Honor, because that one is specifically limited to arrangements. The language that you read at the beginning certainly is... Including but not limited to. Any and all arrangements. Including but not limited to. No, it says any and all arrangements. Then it describes what arrangements are, and then it says including but not limited to. But it references the preparation of screenplay material and production. No, it doesn't, Your Honor. It references these other things in connection with the preparation of screenplay material. If you read it to preclude this claim... Any and all arrangements in connection with the preparation of screenplay material and the production, filming, and exploitation of the motion picture. What it doesn't say is preparation of screenplay materials itself. It wouldn't even make any sense for it to say that, because if you read it that way, you would have to read that she's releasing any claim based on the preparation of screenplay materials in connection with the preparation of screenplay materials. It makes no sense to read it. Why? Because screenplay materials, basically it's a broad general release, and she certainly has a right to be irritated that she only got $2,300 from it, but that's an irritation. She gave a release and got the money. It's a very broad release. It's hard to say that somehow it doesn't include the preparation of screenplay materials when it says screenplay materials, for example. Now, you seem to be making two arguments, and maybe I'm misstating it. You seem to be making an argument for pre-release material as to Sony, and post-release material based on the screenplay, right, her writing contributions. Do you have two different claims or just one claim? No, we have two claims. The claims are, Your Honor, we're only suing respecting this later infringement. But are you claiming the infringement or the ownership was based on her post-release contributions to the movie alone, or are you saying that her co-ownership is based on actions that occurred pre-release or both? Her ownership is based on her having created the screenplay, which did occur prior to the execution of the release. What I'm saying is that this release doesn't cover that claim, and there's nothing here to give her to understand that it covered that claim. And if she thought that it did cover that claim, she wouldn't have entered into this. She got $2,300 for it, as you say. Right. So when it says preparation of screenplay material and she's giving a release of that, what does that mean? Your Honor, What does it mean, preparation of screenplay material? In addition to having written the screenplay or prepared screenplay materials, Well, she contributed. She didn't do all the writing. She did other things. She set up interviews with other dancers. She did all these things that they describe in here. That's what she was releasing. They say including but not limited to. In my experience, when people say including but not limited to, that's really what they mean. There's nothing else in here that goes into arrangements. Well, that's the way they write these things. I spent the first four dreadful months of my legal career, maybe it was five, working for probably the top motion picture lawyer in the city of this country. That's the way they talk. Here before, here after. Absolutely. They're trying to cover the whole world. I agree. Did she have a lawyer when she got into this? She did have a lawyer, Your Honor. A sole practitioner in Toronto who knew nothing about entertainment or copyright law. But she was represented. Can you explain to me the provision that her name not be used? Who inserted that? She did. Why did she not want to impair her career, I gather, at that point? She didn't think that they were actually doing a movie about her. She thought that they were just going to use certain of the materials that she had supplied in connection with a more generalized picture about dancing. And if she was going to have her name used, if they were going to do the story of her life, she wanted to have more than $2,300. So that's what she was trying to protect there. I see. In fact, I think that's a point for us. Why don't we hear from the other side? Maybe they're ready to make a big settlement offer. Okay, I'm ready to listen. Thank you. What law firm are you with? My name is David Fink. I'm with the law firm of White O'Connor Curry, and I represent Paramount Pictures. We've agreed, as long as it's okay with the court, to split our time with the lawyers who represent Sony and Jennifer Lopez, who are with us today as well. Who represents Jennifer Lopez? I do, Your Honor. Gail Sindelic and Albany Myers represent Jennifer Lopez. My representation is slightly less glamorous, Your Honor. We all got to suffer. Yeah. I'll do my best. What's the problem with not giving the plaintiffs the release? Well, the problem is... You can do that without giving the financial terms. The only question is whether or not you've now released, well, given permission to Sony and Lopez to use this. If I'm understanding your question, your question is why didn't we disclose the terms of the settlement between Paramount and Sony to Martyrs Council? Yes. I'm sure that Sony would like to address this as well, but from my perspective, the reason is fairly simple. Number one, she's not a co-owner, and she doesn't have any right to know that. I'm not talking about the specific terms, but I think you could do some redaction. If the only question is, did you validly give... Now, did Paramount validly give Sony permission? If that's one of the links here, then that can easily be satisfied without necessarily disclosing all the terms. I suppose that's true, except that at the time that Martyr signed the release 20 years ago, she relinquished any claim to ownership in the movie, and as we know from copyright law, the right to claim ownership of any derivative works. And so 20 years later, when Sony makes a video that I think is admittedly based on the Flashdance movie, Martyr comes out of the woodwork... You asserted a right. You thought that they had improperly infringed it. Sure, and Paramount had a registered copyright in the movie Flashdance and the right to make derivative works from it. Copyrights were registered in the United States and in Canada, and there was a copyright notice on the film, and Paramount had been exercising exclusive control over all the rights to the movie for 20 years. And so that was a logical thing for Paramount to do. Martyr signed a release, and if you give any validity to the release, Martyr pretty much ceases to exist at the time the release is signed. She was paid money, and she released all claims. I think that the language of the release, which, by the way, the release is entitled a general release, and I think it's difficult to dispute the generality of the release in light of the sort of basic contract law that controls these releases. You know, contracts are understood to be interpreted and to be read as a whole, and words in contracts are understood according to their ordinary meaning. And we've cited some law in our brief that says that the reason to have a general release is just to avoid this exact kind of a circumstance. You know, you can't anticipate every single claim that somebody might make. And so you make a general release, and you ask it to cover, you know, every and any circumstance so that you don't get caught with bad drafting, and you don't say, oops, I forgot to mention the word copyright, or I forgot to mention invasion of privacy, which is a claim that was asserted against Sony, or I forgot to mention this, that, and the other thing. The way to cover yourself is you say everything, whatever it is. And that's what a general release is for, is to protect the beneficiary of the release from an omission. I suppose that every case that has ever been litigated and argued on appeal over a contract would subject the lawyers who argued it to the misfortune of having to look back on the contract and say, boy, I wish I had used different language in the contract 20 years ago. I wish that it didn't say matters. I wish I had, you know, foreseeing this problem, I wish I had used some better word that would have cut off this claim. I wish I had never gone to law school. Exactly. And, you know, maybe at some moments I share that view. But we don't do those things. You may have to go with the plain words of the contract as they fall. I mean, I've had my contracts litigated. Right, and the word matters is an everyday word. It means the events or circumstances of a particular situation. In this case, the events and circumstances were that Martyr had been collaborating to whatever extent we accept the facts in the complaint as true as to the extent of her collaboration for purposes of a motion to dismiss on Rule 12b-6. Let me approach it differently. Let's assume that Sony just made a new movie about the life of a Canadian dancer who happened to be named Martyr. You would not suggest that she'd given up her rights by executing a release to you, that she'd given up all her rights including perhaps a claim for appropriation of publicity, invasion of privacy. I mean, the release can't be read that broadly. That's a very interesting question because the second paragraph of the release, or actually the second and third paragraphs of the release which you guys, you justices pointed out earlier, does give the right to her life story to Paramount. And it does give Paramount the right to exploit it in any medium in any version. What it doesn't do is it doesn't give Paramount the right to associate her name with it. So in the hypothetical that you proposed, we wouldn't be able to say it was the life of Maureen Martyr. No, Sony couldn't do that. I mean, if they said this is the life of Maureen Martyr, you might both have claims for different reasons is all I'm suggesting. That might be true. The release doesn't cover Sony making a movie about her life. Well, admittedly, the release does not give Paramount the exclusive right to license her life. It says that it's a non-exclusive right with respect to her life story. So admittedly, if she wanted to make a movie or license a movie herself to make her life story, she certainly could do that. I mean, these things happen all the time. In fact, in the al-Muhammad case, which I believe Judge Noonan helped to decide, in that case, the issue was the contribution of an Islamic technical consultant on the Spike Lee, Malcolm X movie. And in that case, the technical consultant, who was claiming co-authorship, also had made a movie about Spike Lee's life. It was a documentary, and he wrote, directed it, produced it. He still didn't happen to be a co-author of the Spike Lee movie. So certainly, I'm sure we could come up with some kind of hypothetical that would allow Martyr to have some rights against somebody. But in this case, based on the pleadings that we have here, it is impossible, in my mind, to imagine that this release doesn't cover it. There is no allegation, just to clarify one thing, that Martyr made any contributions of any kind to Flashdance or any other endeavor vis-à-vis Paramount after the date that the release was signed. So all matters includes everything that happened. Yes, I think you've clarified that. Yes, so it is what it is. I wanted to point out also, with the little bit of time that I have, that one of the things that strikes me about this case is the fact that the Copyright Act was amended in 1976 with the aim at clarifying and solidifying the rights of people who were investing in large endeavors, such as artistic endeavors, because they're very expensive. And the certainty of knowing that you're investing in something that is very expensive is a critical element to enticing people into doing these things. According to the analysis that I'm reading and seeing from my opponent, Martyr could have, assuming that Sony didn't make the I'm Glad video and everything was quiet here, another 17 years or 20 years could pass, and whatever else happened in the future could trigger this claim, that the statute of limitations would essentially be indefinite forever under this scenario. And, you know, a lot of money is spent on promoting motion pictures. I think the language... Do you argue that we should limit the extension of copyrights? No, certainly not going to make that argument. I think I might lose my job if I did. But I am going to say that the language that we find in Zwil and in the Disney case about, you know, a plaintiff shouldn't be able to lie in the weeds for, in this case, 17 years and then pounce on the prize when it becomes available is very appropriate. And I think the recognition from the Disney case, which was a patent case, that, you know, there are such things as airplanes and automobiles and motion pictures and they're very expensive, is an appropriate observation in a case like this. You know, Marder herself alleges that this movie was a cultural phenomenon, that it was very popular, that a lot of effort was devoted to promoting it, all the people that were involved in this movie. It's too bad it lost so much money. It's too bad it lost so much money. That's right. I never heard of it until I was a kid. But I live in a different world, you know. Well, I wouldn't say that you're the only one. I wouldn't say that you're the only one, but I would venture to guess that most of the people in this room probably have heard of it. And I know that I'm dating myself a little bit, but when I was in high school, I can tell you that this movie was very popular for people my age to watch. You can understand the reaction. She may have well thought that, well, I messed up back in there. I signed my rights away. I didn't anticipate this, but I'm going to stick by my word. But when somebody else uses the product, then I'm getting a little upset about it. And that's not necessarily lining the weeds. It's in response to a new development by a third party that Paramount had not given permission to use either. I mean, that Paramount wasn't happy with the situation, so. But, you know, she... Did she represent them enough in the negotiations or suit on this, too? Do I have to answer that? The answer is yes, I did. I think the answer to your question, though, is that, you know, whatever mistake that she made. I'm very agile. I'm good at pouncing. But I think the answer is that whatever right she may have had, you know, I guess I would say I'm sorry that she slept on her rights or I'm sorry that she wasn't aware of this. But she was represented by the council of her choosing, and she did agree. And she stuck by her agreement. She's not waiting, though. I'm suggesting that when you say she waited in the weeds all these years, she looks to me as though agreed to be kept... She kept her bargain, except when something new developed. Maybe a more appropriate analogy is that she was asleep, and she wasn't waiting in the weeds to pounce, but suddenly something happened that woke her up. Either way, I think it's appropriate. And, you know, it's not as though there was... In my thinking, it's not as though there was maybe... that there was anything else that we could or should have done as Paramount. She signed a release, which Paramount certainly believed, and I believe, covers the claim. And, in fact, we cited to a treatise that suggests that when you're signing away life rights, that's what you do. We registered a copyright. We didn't give her credit in the film as an author. There's no manifestation in any way that anybody was ever assuming or pretending or acting as though she was an owner. Unless there are any questions, I think I have to give the microphone over to Ms. Sandali, who I think is going to kill me after this for taking up all the time. We'll give her a little extra. Good morning, Your Honors. Dale Sandali from O'Melanie and Myers Council for Sony Music and Jennifer Lopez. In addition to the arguments made by Paramount, there are two independent reasons unique to my clients that the dismissal should be affirmed. Namely, the lack of subject matter jurisdiction and the fact that to the extent there is any claim, and we don't think there is because of the release and the statute of limitations, it's not against Sony and Ms. Lopez because we've had permission. How do we know that? Pardon me? How do we know that? Well, we know that because that's what they pled in their complaint, which on a motion to dismiss is what we have to go by. In their complaint, they specifically state in paragraph 20 that Paramount asserted a claim against Lopez and Sony for copyright infringement and that that claim was settled for compensation. Right, but we don't, well. Later in the complaint, in paragraphs 53 and 54 in the record at ER 10, that Martyr alleges that Paramount has received from Lopez, Sony, and others, monetary or other consideration for the licensing or other exploitation of the copyrights in the motion picture flash dance. That's what she's pled on a motion to dismiss. That's what she has put in issue. That is. That one's on information and belief, though. It can be. That's my only question. And your answer is aside from the complaint and file on information and belief, we don't know. As we sit here, you know, but we don't. No, I disagree with Your Honor for two reasons. One is that she says it on information and belief, but the point is it's her complaint. She's saying that there was permission. That's the predicate of her whole cause of action. With that predicate of permission, that expunges the right to sue against Lopez and Sony. She might have a claim against Paramount, if there weren't other problems, to try to get her share of the proceeds, which according to her appellate papers, that's what she's seeking, her share of the proceeds. But it doesn't mean that she has a claim for infringement. Maybe we weren't communicating. I said aside from the four corners of the complaint for whatever they mean, we don't know. Well, we do know. On this record. I think you were starting to get to that, but then you got back to the complaint. Forgive me. In the record at ER 94 is the confirmation of what was said in the complaint. You asked my co-counsel, well, where's the agreement? Couldn't you have redacted it or something like that? Your Honor, I submit it's difficult to redact an oral agreement. What we did is the next best thing. We gave them a letter, and the letter is from Paramount to Sony Music Entertainment, and it says this is to confirm the prior oral agreement between Paramount Pictures Corporation and Sony Music Entertainment, which provided that Paramount granted Sony permission to use elements from Paramount's film Flashdance in the music video entitled I'm Glad featuring Jennifer Lopez. Now, they argue, they ignore in their reply brief, they ignore the allegations in the complaint, which we think are dispositive. Are you representing to us that there's only an oral agreement and this written document, and this written letter, that's it? Absolutely. On this settlement. That's right. I mean, these companies do business together all the time. It's not at all unusual. I think that one of the things I learned in working with the entertainment business is that how often major things can be done on little bits of paper with the idea that maybe there'll be a long form, and then the long form very often never, ever materializes, much to the boon of future litigants occasionally. Yes. But in any case, what matters is it doesn't matter. No, but thanks for clarifying the status. Whether it was a dollar, whether it was $100, it really doesn't matter. The point is her claim is limited to a claim if she had it, but not for the release and other things, would be limited to a claim for contribution or share of the proceeds and does not give her the right to sue my clients. But let's go to the other issue why she can't bring this suit, and that is because she's put the cart before the horse, as Judge Noonan has alluded to. The law is also clear, copyright law is clear, that you have to have a copyright registration in order to bring a lawsuit. That's the whole point of Section 411A of the Copyright Act. Well, Marder argues, well, I don't need to have it. I can rely on the fact that Paramount has a copyright registration and go by that. Except that would be an unprecedented expansion of 411A, and would put 411A at odds with 501B of the Copyright Act. The case law is very clear on this, that the requirements of 411A are met by either having the copyright registration yourself in your own name, or if you can show a chain of title that you've become the affidavit, and you can show that you're now the owner of that registration. Or, if you can show that you are the exclusive licensee. The exclusive licensee is there because of Section 501B, which says that the legal or beneficial owner of an exclusive right under the copyright, subject to the requirements of 411, showing how these provisions work together, can institute an action. We have not found any case where anyone has been able to maintain a copyright lawsuit and establish subject matter jurisdiction in facts such as this, when someone is claiming that they should have been a joint author. They should have been, perhaps, listed on a copyright registration, but were not. The case, the only case that Marder relies on in her brief is the Tang case, but the Tang case from Eastern District of Pennsylvania is simply an exclusive licensee case, so that's not helpful. The case that we found that was the closest to the facts of our case is cited at page 12 of our brief, and that's the Techniques case from the Southern District of New York. And there, the plaintiffs claim that a copyright registration was invalid because it failed to list the plaintiffs as joint authors. A little bit closer. The court said that even if this were true, it would not be sufficient to give the court jurisdiction over the infringement claim, as plaintiffs did not own that copyright registration. What the statute sets up is the idea that you have to apply, even if you're denied copyright registration, 411A goes on to show a procedure where, based on that denial, you might be able to use that to get to court and to bring in and give the opportunity for the Copyright Office to have a say in the proceeding on the issue of registrability. And I think all of this goes to the fact that 411A and 501 serve as useful gatekeeping functions. If everybody could sue, not just the person who they think directly, you know, they should have rights to, they're a joint author of, but if everybody could also do, like in this case, also sue third parties who they believe are infringing their rights when they haven't yet established that they have the rights to infringe, the number of cases, the number of cases that could go to federal court would be expanded. So that's why the law works like this. You can't put the cart before the horse. There were things in the statute that she clearly should have done to first obtain a registration or a denial of a registration, and because of that, there's no subject matter jurisdiction. What about this co-ownership business? It doesn't matter because she's not listed under the registration as a co-owner. She hasn't established that she's a co-owner. I think she's talking about the action to determine co-ownership or the claim. Well, in an action to try to determine co-ownership, there's a couple of different things that could be done by someone. One thing that could be done and is often done is someone applies for a copyright registration. Sometimes they're granted it. It's not at all unusual for the office to sometimes grant both rights, or if they're denied. If they're denied, 411 permits the person to bring a suit saying that they were improperly denied. The techniques case suggests another procedure. If someone is suing specifically saying that a registration should have listed them and was wrong, it suggests that perhaps another procedure might be to take issue with the Copyright Office and go by writ of mandamus and challenge the Copyright Office. But in any case, we haven't found any case that has said you're not listed, you're not in the chain of title, you're not an exclusive licensee, you think you might be an owner. You can't use that in and of itself to get to court, and that's jurisdictional. You know, I'll just conclude. We've talked a lot about the release, but I do want to also point out that the release applies not just to assigns, as Your Honor was discussing earlier, but also to licensees, and that the release is clearly, as was discussed, not just about matters arisen, but anything based on those matters. And here, there's no dispute. Everyone seems to be in agreement, at least now, that whatever the, there was the contribution, whatever it was prior to the release, there was the film, and then there was I'm Glad, which was based on the film. If it was based on the film, it would have been based on the contribution. Certainly, there's been no allegation of anything else. So by every stretch of the imagination, our position is simply that this was released. Because it was released, there's no issue of statute of limitations or anything like that. In any case, as to my clients, there's a jurisdictional issue. And beyond that, because there is permission, there's certainly no claim against Ms. Lopez and Sony Music. The beef is not with us. Thank you. I think you're the first lawyer I've ever met who really enjoys copyright work. My sister did this many, many years ago. We went to law school together at Columbia. And I think she was glad to get married and get out of that place. Well, I'm happy to report that while at one point copyright was considered dull, I think now, from at least our recruits and some of our associates, they're all clamoring to do this kind of work. So at least I'm a good company. Thank you. Thank you, Your Honor. I think I may be the second geek you've ever met that likes doing copyright work. It's fascinating. It was one of Mark Twain's favorite subjects. You ought to read his testimony before the House Judiciary Committee on Copyrights. And you'd think that you were in present times when you listened to what he had to say. Take a look. Same issues. I do want to address the issue of Sonny and Lopez supposedly getting permission. There's nothing in the complaint that says they got permission. What it says in paragraph 20 is that they settled the claim. Right, but then you later say that on information belief that they received royalties by a license or something in the language you point out. So you may be stuck with that. The letter that Ms. Sandali referred to was drafted the day before they filed their reply to the motion to dismiss. So that clearly is not admissible evidence, and it doesn't really say very much either. No, but paragraph 53 is what she was talking about, which is Plaintiff is informed and believes that Paramount received from Lopez, Sonny, and or others monetary or other consideration from the licensing or other exploitation of the copyrights. Or other exploitation of the copyrights. Or other matters. Pretty broad. I guess the one thing I want to emphasize is the fact that there was an affirmation by Paramount within a year after this release was executed where they tried to get additional rights. Well, not additional rights, but rights from Martyr for a sequel. Now, they point out they didn't have to do that, and I agree they didn't have to do that, but they did do it. Why did they do it? Why did they go to Maureen Martyr and ask her for rights to do a sequel if she had no rights anymore? If she had released all of her rights? If any claims that she could possibly make had been released by the terms of this so-called general release? That's the only extrinsic evidence before the court. Lawyers are very careful people. They're paranoid. Well, that's true, and that's a possibility. They were trying to wear suspenders with their belt. Or maybe they were trying to do the right thing and make sure that your client was compensated if they made a remake or a sequel. Anyway, there are lots of answers to that. You don't puzzle us with that one. I don't think there's much consequence as to the scope of the release back many years ago. Well, this happened within a year, within a year afterwards. And while there are lots of explanations for it, all reasonable inferences are in favor of the plaintiff. And I think the most reasonable one is that they thought there were more rights, that she still retained rights. There was no reason for them to go back to her if she didn't. I think that's all I need to say, unless there are additional questions. Thank you very much. We've been open to settlement. We've never heard a word from the other side. I may want to make a remake. I may want to do a sequel. Maybe we can go down to Madras right now and all of you get together and settle the case. We're open to it. Or settle a future case. Thank you very much. Or lifetime pass to all Paramount and Sony pictures. I don't know if that's going to do it. Thank you. Thank you. And the matter of staying submitted. We enjoyed the argument. And the court will adjourn.
judges: Pregerson, Noonan,thomas